159 So.2d 813

**Ex parte T. L. THAGGARD.**

**3 Div. 146.**

Court of Appeals of Alabama.

April 25, 1963.

Rehearing Denied May 14, 1963.

Johnson, J., dissented.

Whitesell & DeMent, Montgomery, for petitioner.

Richmond M. Flowers, Atty. Gen., and Robt. P. Bradley, Asst. Atty. Gen., for respondent.

PER CURIAM.

This is an original habeas corpus proceeding wherein we have heretofore caused to be issued the writ requiring the Sheriff of Montgomery County to have the body of T. L. Thaggard before us so we may examine into the cause of his detention. This return was made to us April 23, 1963.

We confine this opinion strictly to whether Thaggard should be committed to await action of the next grand jury on a particular criminal charge. No civil matters are before us.

This question is further confined to (1) whether the Acting Recorder of the City of Montgomery had authority to hear and (2) whether, on that hearing, there was sufficient legal evidence to support, to the required degree, a charge as follows:

"* * * that * * * Thaggard, did falsely pretend to Mrs. Edieth [sic] Owen, the agent, servent [sic] or employee of Union Bank & Trust Co., a corporation, with intent to defraud, that he had on deposit in Union Bank & Trust Co. * * * the sum of Forty Three Thousand Dollars, and

by means of such false pretense, obtained from the said Union Bank & Trust Co., a corporation, $43,000.00 against the peace and dignity," etc.

I.

Our criminal law puts the commencement of its process upon private *accusation* rather than upon *inquisition*. Thus, an accuser may not only go before a magistrate, he may also request audience to present legal evidence to a grand jury.

█ Committing magistrates do not have a roving commission to ferret out crime. Hence, if the accusation will not support perjury (2 C.J.S. Affidavits § 18) the magistrate cannot, without the accusation being properly done over, take up the case. See Mitchell v. McGuire, 244 Ala. 73, 12 So.2d 180.

Thaggard, who went voluntarily to police headquarters, was brought into the Recorder's Court of the City of Montgomery on a warrant signed by an acting desk sergeant of the police department.

This warrant, in turn, was based on an affidavit made before the acting desk sergeant who, according to its text, had before him Mark W. Johnston, who is therein stated as having deposed to him, the desk sergeant, that he, Johnston, believed or had probable cause to believe, that Thaggard did, etc., as above quoted.

█ However, Johnston did not sign or swear to the affidavit. Rather, it purports to be sworn to and subscribed by the Union Bank & Trust Company with Johnston's name and title appended. Thus, we consider there was a fatal variance between the body of the affidavit and its subscription.

██ A corporation ordinarily cannot, without statutory authority, make an affidavit. 19 C.J.S. Corporations § 966. Cf. § 854, T. 7 of the Code. In criminal complaints, unless otherwise enacted, a competent witness must make the original

affidavit. 22 C.J.S. Criminal Law § 305. We have not found any act which confers on incorporated banks or other corporations authority to make such affidavits.

We are clear to the conclusion that the acting recorder should have granted the motion to quash the warrant based on the void affidavit.

We do not need to go into whether or not the charge against Thaggard should have originated in manner and form as provided under T. 15, §§ 119–123 of the Code as distinguished from that employed under claim of power by virtue of an ordinance.

## II.

As to the evidence, we find here no forgery, nor question of fictitious account, but the following does appear:

(1) Thaggard had an account with Union Bank & Trust Company in Montgomery under his business name, "Alabama Motors";

(2) Thaggard, about 11:00 A.M., March 6, 1963, came up to Mrs. Edith Owen, a teller, who was at her work place behind the teller's counter in the Union Bank & Trust Company and asked her to "get his balance";

(3) Mrs. Owen got the figures to put on a slip of paper by phoning the Bank's bookkeeper;

(4) Mrs. Owen gave Thaggard this slip of paper stating the balance standing to his account under "Alabama Motors" to be $43,498.38.

(5) Thaggard handed Mrs. Owen a check on his account in the name of Alabama Motors with Union Bank & Trust Company payable to order of cash for $43,000.00 signed by him;

(6) Thaggard, at Mrs. Owen's request, endorsed this check which he had just presented her;

(7) Mrs. Owen made a second telephone call from her teller's cage to the bookkeeping department. The testimony was:

"Q Well now, the bookkeeping department informed you that as of the time that Mr. Thaggard was there, that he had in his account $43,498.38, did it not?

"A Yes sir, the girl answered the phone did.

"Q All right. And did you reverify this to see if there were any checks that had come in which might be a charge against you?

"A I can remember that I called her back and asked her for a posted balance and see if everything was clear, which meant no uncollected funds against the account.

"Q All right. Now, when Mr. Thaggard presented the check to you with his endorsement, it was honored by you acting for the bank, was it not?

"A Yes.

"Q And it was paid when he presented it for payment with his endorsement?

"A That's right. To check and recheck his balance.

"Q It was not dishonest?

"A No.

"Q All right. Now, the check that was shown to you has been introduced to you by the Solicitor, I am showing you the photostatic copy of that exhibit. Is it—

"THE COURT: Exhibit 1.

"Q (continuing) Exhibit 1, there is no indication on that check that it has ever been dishonored?

"A (looking at it) What do you mean?

"Q That it has ever been turned down by the bank?

"A  I don't know.

"Q  It was paid?

"A  He got the money, yes sir.

"Q  You paid him the money, didn't you, Mrs. Owen?

"A  That's right.

"Q  There is no where accounted for insufficient funds or no account or anything of that nature on there, is there?

"A  No sir."

(8) Mrs. Owen, other tellers and a vault boy spent thirty minutes rounding up the money;

(9) The bills were counted three times; and

(10) Mrs. Owen paid Thaggard $43,000.-00 in currency and he left the bank.

Thus it is clear that steps 7, 8 and 9 in the above list all intervened between Thaggard's handing Mrs. Owen the check and her paying the money.

The State asks us to put some reliance on a purported admission made by Thaggard later in the day that he knew the money was not his.

This fragment of Thaggard's conversation was part of the conference he had later with a number of bank officials. It is undisputedly clear that only after the bank's chief auditor had demonstrated from the original deposit slips that the bulge in the Alabama Motors statement came from posting three Alabama Power Company deposits to the neighboring account number is there any evidence of Thaggard's conceding that the money was not his.

Hence, this testimony can shed no light on Thaggard's thoughts as he handed Mrs. Owen the check after she had told him he had $43,498.38 in the bank. Under Hinman v. State, 179 Miss. 503, 176 So. 264, the state of mind at the moment of uttering the token claimed to be false is critical.

We quote from Commonwealth v. Drew (1837), 19 Pick. (36 Mass.) 179—in a court presided over by one of America's finest judges, Lemuel Shaw—the statement of the case:

"The pretences alleged were, 1. that the defendant assumed the name of Charles Adams; 2. that he pretended that he wished to open an honest and fair account with the Hancock bank, and to deposit and draw for money in the usual manner and ordinary course of business; and 3. that he pretended that two checks, described in the indictment, were good, and that he had in deposit the amount for which they were drawn.

"It was proved, among other things, that the defendant began to deposit money in the bank early in December 1835, and that he continued to deposit and draw, at various times and in various sums, until the 27th of January, 1836, on which day, having only $10 deposited to his credit, he drew a check for $100, which was paid at the bank.

"On the 30th of January, 1836, a check for $350 was drawn by the defendant and paid at the bank, he having made no deposit since the payment of the check presented on the 27th of January.

*   *   *   *   *   *

"Samuel B. Dyer, a witness on the part of the Commonwealth, testified that he was the paying and receiving teller of the bank; that the defendant first did business at the bank on the 12th of December, 1835; that he asked to have a large bill of the United States bank exchanged for small bills, which was done; that before he left the bank he made a deposit of a considerable sum, including the bills just before received as above; that being asked in what name he wished to deposit, he said, in the name of Charles Adams; that he saw the defendant several times afterwards, when he presented his checks for payment; that the defendant usually drew his checks in the bank,

at the desk kept for that purpose, and presented them himself, and that this was usually done by him about 12 o'clock, the most busy time in the forenoon; that the witness had no recollection of the presentation or payment of either of the two checks in question, which were overdrafts; that he knew they were paid out of his drawer, and by his money, because he found the checks in his drawer and missed sums of money corresponding with the amount of the checks; that he believed that the check of January 27th was not paid by himself, but by the bank messenger for him, who took his place a few minutes at the counter, the messenger having told him he had paid a check of Charles Adams; that the witness paid checks of the defendant unhesitatingly, because he had deposited for some time, and the witness presumed his checks to be good, from the general character of his account, and having seen him conversing with the president of the bank, the witness presumed he was acquainted with the president; that if the witness paid either of the two checks in question, without inquiring at the desk of the book-keeper, or looking at the balance-sheet, to ascertain whether the defendant had money to that amount deposited, it was upon these grounds that he so paid.

"It was in evidence, that the book-keeper's desk was a few feet from the teller's counter; that when the teller doubted whether a check should be paid, he inquired of the book-keeper, or looked at the balance-sheet kept by the book-keeper, which was made up to the end of every day, and lay upon the desk for the inspection of the teller or book-keeper at all times.

"It was testified by the teller, that the overdraft of the 27th of January was not reported for some days after it happened; and the balance-sheet showed that it did not appear upon that book until the 1st of February."

Morton, J., in the course of delivering a well considered opinion covering many aspects of false pretense, speaking for a unanimous court, said in part:

"To constitute the offence described in the statute and set forth in these indictments, four things must concur and four distinct averments must be proved.

"1.  There must be an intent to defraud;

"2.  There must be an actual fraud committed;

"3.  *False pretences* must be used for the purpose of perpetrating the fraud; and

"4.  The fraud must be accomplished by means of the false pretences made use of for the purpose, viz. they must be the cause which induced the owner to part with his property.

\*    \*    \*    \*    \*    \*

"The *pretence*, if any such there were, that the check was good, or that the defendant had funds in the bank for which he had a right to draw, was *false*. He had no such funds. Did the defendant make any such pretence? He made no statement or declaration to the officers of the bank. He merely drew and presented his checks and they were paid. This was done in the usual manner. If then he made any pretence, it must result from the acts themselves.

"What is a false pretence, within the meaning of the statute? It may be defined to be a representation of some fact or circumstance, calculated to mislead, which is not true. To give it a criminal character there must be a *scienter* and a fraudulent intent. Although the language of the statute is very broad, and in a loose and general sense, would extend to every misrepresentation, however absurd or irrational or however easily detected; yet we think the true principles of con-

struction render some restriction indispensable to its proper application to the principles of criminal law and to the advantageous execution of the statute. We do not mean to say that it is limited to cases against which ordinary skill and diligence cannot guard; for one of its principal objects is to protect the weak and credulous from the wiles and stratagems of the artful and cunning; but there must be some limit, and it would seem to be unreasonable to extend it to those who, having the means in their own hands, neglect to protect themselves. It may be difficult to draw a precise line of discrimination applicable to every possible contingency, and we think it safer to leave it to be fixed in each case as it may occur. 2 East's P.C. 828; Young v. The King, 3 T.R. 98.

"It is not the policy of the law to punish criminally mere private wrongs. And the statute may not regard naked lies, as false pretences. It requires some artifice, some deceptive contrivance, which will be likely to mislead a person or throw him off his guard. He may be weak and confiding and his very imbecility and credulity should receive all practical protection. But it would be inexpedient and unwise to regard every private fraud as a legal crime. It would be better for society to leave them to civil remedies. Roscoe on Crim.Ev. (2d ed.) 419; Goodhall's case, Russ. & Ryan, 461.

\* \* \* \* \* \*

"The representation is inferred from the act, and the pretence may be made by implication as well as by verbal declaration. In the case at bar the defendant presented his own checks on a bank with which he had an account. What did this imply? Not necessarily that he had funds there. Overdrafts are too frequent to be classed with false pretences. A check, like an order on an individual, is a mere request to pay. And the most that can

be inferred from passing it is, that it will be paid when presented, or in other words, that the drawer has in the hands of the drawee either funds or credit. If the drawer passes a check to a third person, the language of the act is, that it is good and will be duly honored. And in such case, if he knew that he had neither funds nor credit, it would probably be holden to be a false pretence.

\* \* \* \* \* \*

" \* \* \* If the checks in question had been passed to a third person, it could not be said that the defendant knew that they would not be paid. On the contrary, he had an open account with the bank, and although he knew there was nothing due to him, yet he might suppose that they would be paid. And the fact that he presented them himself, shows that he did not know that they would be refused.

"The defendant presented the checks himself, at the counter of the bank. They were mere requests to pay to him the amount named in them, couched in the appropriate and only language known there; and addressed to the person whose peculiar province and duty it was to know whether they ought to be paid or not. He [the teller] complied with the requests, and charged the sums paid, to the defendant, and thus created a contract between the parties. Upon this contract the bank must rely for redress."

One hundred years later, 1942, the Supreme Court of Missouri had before it an analogous set of facts claimed to support a conviction of false pretense. Indeed, if anything the evidence was clear that the defendant, Herman, had more reason to surmise the state of his bank account than did Thaggard on this record.

From this opinion, State v. Herman (Mo.), 162 S.W.2d 873, which has never been questioned by another court, we quote:

"It is not necessary that the injured party should have conducted an investigation as to the falsity of the pretense to make it an offense. 25 C.J. 598, 599, section 26. State v. Starr, 244 Mo. 161, 148 S.W. 862; State v. Donaldson, 243 Mo. 460, 148 S.W. 79. But it is the victim's duty to avail himself of the means of detection at hand at the very time to determine the truth or falsity of the accused's representations. 25 C.J. supra; State v. Cameron, 117 Mo. 641, 23 S.W. 767; State v. Lawrence, 178 Mo. 350, loc. cit. 384, 77 S.W. 497.

"In this case the appellant asked the cashier of the bank what his balance was, and the cashier used the very means at hand to determine that balance; namely the ledger sheet. He also had at hand at the very time the means (the files of the bank) to have determined that three of the appellant's checks totaling $51 had already been cashed that day. He was not prevented from examining these files by the appellant.

"It is true that the appellant told the cashier that he had only drawn three checks totaling $120; yet, he at no time told him what his balance was. In fact, he asked the cashier that question, and, to answer it, the cashier used the bank's records to ascertain the balance, and he was not prevented from using all the records available at hand at the time by any false pretense of the appellant.

" 'It is well settled law, both in this state and elsewhere, that it is not every false pretense which can be made the basis of a criminal prosecution. It must be such an one as is calculated to deceive.'

"We are of the opinion that the judgment is unsupported by legal evidence and appellant's demurrer should have been sustained."

*Held,* the conviction was due to be reversed.

In First National Bank v. Hall, 119 Ala. 64, 24 So. 526, we find Coleman, J., saying:

" * * * A verbal instruction by a depositor to a cashier to apply his money on deposit in a certain way is sufficient authority. A check might furnish more complete and satisfactory evidence of the authority, but a check is not necessary to confer the authority. * * *"

In the light of the office of the check given to the bank on which it is drawn by the person who has the account there as shown in Commonwealth v. Drew, supra, we can say that Thaggard's check served as: (1) an order for payment; and (2) evidence of receipt of cash.

Giving a check to a merchant is using the check's power to command money as the equivalent of money itself. But asking for money from one's banker is a debtor-creditor transaction in which the check's power to command money depends on deposits and credits to the customer's account.

In the absence of an express representation as to the money due, the source of the check's power at the bank is in the bank. The paper on the counter is evidence of the customer's belief of what his banker will pay. This makes the event a future one or the check a mere expression of opinion. Whatley v. State, 249 Ala. 355, 31 So.2d 664, 174 A.L.R. 169.

In Primus v. State, 21 Ala.App. 630, 111 So. 194, Rice, J., in reversing, said:

" * * * It is elemental that for a conviction on a charge of this kind to stand the evidence must show that the false representation alleged to have [been?] made *operated* as an inducement for the injured party to part with his goods. * * *" (Italics added.)

We quote from Brickell, C. J., in Woodbury v. State, 69 Ala. 242:

" * * * It was the duty of the court to instruct the jury, that if the misrepresentation was not an inducing, con-

trolling motive with the prosecutor to part with the machine, there should not be a conviction of the accused upon either of the counts for false pretenses. —Commonwealth v. Davidson, 1 Cush. 33. It is not necessary to pass upon the other exceptions, as this view will probably be decisive of the case on another trial.

"Reversed and remanded."

And we find the Texas Court of Criminal Appeals, in a 1962 opinion saying, per Woodley, P. J., in Thornton v. State, 171 Tex.Cr.R. 565, 352 S.W.2d 742:

"To sustain a conviction for theft by false pretext, it must appear that the false pretext was the inducing cause which moved the injured party to surrender to the accused the property in question." (Citing cases.)

See also State v. Lien, 72 S.D. 94, 30 N.W.2d 12.

Section 143, T. 5, of the Code makes it a misdemeanor for a banker, bank officer, etc., "wilfully and knowingly" to overdraw his account with said bank so as to obtain money of the bank.

We recognize that, since the Drew case, the overdraft in American banking, particularly with the advent of the Federal Reserve System with its emphasis on interbank discountability, has lost much of its historic function as a means of a bank's lending money. But overdrafts are not unknown; indeed, most published bank statements nowadays show them.

Carrying the State's contention here to its logical end, we should have to say that virtually every noncollusive overdraft, wittingly or unwittingly made, was prima facie a case of false pretense whether for forty-three cents, forty-three dollars or forty-three thousand dollars.

The effect of such a holding would be that a banker who failed to complain to the authorities of each and every overdraft above the line between petty and grand larceny (i. e., $25.00 or more) might well be compounding a felony. For grand juries to cull the flocks would take more than the wisdom of Solomon.

When we note that under section 143 of the banking law, supra, a banker can be punished only as a mere misdemeanant, how could we rationally declare that the Legislature intended that the customer who overdraws should be a felon?

We expressly confine ourselves (1) to the evidence which was before us; (2) to the transaction at the teller's counter; and (3) *solely* in the light of a charge of false pretense.

We consider the petitioner, Thaggard, is due to be released from custody. Accordingly, it is ordered and adjudged that said petitioner be

Discharged.

JOHNSON, J., dissents.