STATE of Iowa, Appellee,

v.

Patrick E. MULLIN, Appellant.

No. 57428.

Supreme Court of Iowa.

Jan. 22, 1975.

James F. Fowler, of Wilson & Goodhue, Indianola, for appellant.

Richard C. Turner, Atty. Gen., David E. Linquist, Asst. Atty. Gen., and Robert A. Gottschald, County Atty., for appellee.

Heard by MOORE, C. J., and MASON, REES, UHLENHOPP and REYNOLDSON, JJ.

REYNOLDSON, Justice.

Defendant bank customer was charged with falsely uttering his own check at his own bank on an overdrawn account. Following his conviction for violating § 713.3, The Code, he appeals from judgment sentencing him to seven years imprisonment. We reverse.

The 21-year-old defendant had a seventh grade education. On July 28, 1973 he opened his first checking account in Peoples Trust and Savings Bank (of Indianola) with a $10 deposit. Thereafter he made several small deposits and wrote a number of small checks. The largest balance in defendant's account at any time was $10. Mr. T. J.

Nicholls, the bank's cashier, became aware the account was overdrawn on September 14, 1973. After that date the bank continued to honor defendant's no-fund checks, several of which were counter checks payable to defendant. Defendant's account was overdrawn $108.64 on September 28, 1973, after which no more checks were posted against it.

October 5, 1973, defendant, in the bank's Milo branch office, drew and presented for payment a $45 counter check stamped payable to "Myself Only at the Counter." Mrs. Dorothy Uttley, manager of the Milo office, asked defendant if he had an account in the bank and if he was working in the locality. After he answered both questions in the affirmative, she accepted the check and gave him $45 in cash.

Mr. Nicholls testified he supervised the bank's bookkeeping system (located at Indianola), authorized payment of checks, and determined whether checks written on overdrawn accounts would be honored. He conceded the bank had a lenient policy concerning overdrafts, and frequently would, in effect, extend credit by honoring checks drawn on accounts with insufficient funds. When a customer's overdraft exceeded $20 his name would be added to a list promulgated to bank personnel. In the ordinary course of procedure defendant's name would have been on a list available to Mrs. Uttley, but she did not refer to the list when she cashed defendant's check.

The $45 counter check from the Milo office arrived in Indianola October 6, 1973. Mr. Nicholls testified, "On October 6 there was not sufficient funds in the account to pay the check. So, the normal course of business, bookkeepers do not post it and I make a decision the following day as to whether it would be paid, creating or increasing an overdraft, or whether I'd return it marked insufficient funds. On October 7, 1973 I made the decision we would mark it insufficient funds and not pay it." Of course, the check had already been paid at Milo. Mr. Nicholls merely decided not to post it to defendant's account.

October 24, 1973, Mr. Nicholls discussed this and other checks (which had been posted to the overdrawn account) with defendant, who denied signing the other checks. Mr. Nicholls requested him to return the next day to sign an affidavit the signatures were not his. When defendant did not appear on October 25, Mr. Nicholls turned the $45 check over to the county attorney.

Defendant testified in his own behalf. He knew he had no funds in his account to pay the $45 check. He claimed at the time he wrote it he intended to deposit a check for wages he was to receive in a few days. He had made no specific arrangement with the bank to pay overdrafts. Defendant never offered to, and did not, repay the bank.

We are persuaded this appeal may be resolved by consideration of only one of several grounds defendant urges for reversal.

I. The crux of this controversy is whether our law requires that a person who parts with money in exchange for a no-fund check be deceived in the transaction, and if so, whether a payor bank whose responsible employees know a customer has an overdrawn account may be legally deceived when it pays the customer's counter check presented without extrinsic misrepresentations. The State does not deny these issues were properly preserved below by appropriate motions for directed verdict and for new trial.

Defendant was charged under § 713.3, The Code:

"Any person who with fraudulent intent shall make, utter, draw, deliver, or give any check, draft, or written order upon any bank, person, or corporation and who secures money, credit, or thing of value therefor, and who knowingly shall not have an arrangement, understanding, or funds with such bank, person, or corporation sufficient to meet or pay the same * * * " [shall be guilty of a felony or misdemeanor depending upon the amount].

The county attorney's information alleged the check was made, uttered and delivered to Peoples Trust and Savings Bank, willfully and with intent to defraud said bank.

■ Our recent decisions have identified the elements in a § 713.3 offense thus: 1) an intent to defraud, 2) securing money, credit or other thing of value by means of a check, draft or written order, and 3) knowingly not having any arrangement, understanding, or funds with the bank, person or corporation upon which the check or other instrument is drawn sufficient to meet or pay the same. See State v. Mason, 203 N.W.2d 292, 295 (Iowa 1972); State v. Johnson, 196 N.W.2d 563, 565 (Iowa 1972); State v. Kimball, 176 N.W.2d 864, 865 (Iowa 1970).

■ While the element of another being defrauded or deceived has not been separately isolated in our decisions since State v. McCutchan, 219 Iowa 1029, 1031, 259 N.W. 23, 24 (1935), it is clearly subsumed under the language of the second element above set out. It is plain one could not secure money "by means of" a worthless check if the person or entity cashing the check knew it was of no value.

And in practice, by separate instruction the jury ordinarily is so told, as it was in this case, that it must find beyond a reasonable doubt the person parting with the money for the check "was deceived thereby." See The Iowa State Bar Association Uniform Criminal Instruction 510.5. On appeal, the State now asserts the comparable instruction submitted to the jury below is incorrect "in that the knowledge of the victim cannot affect the intent of the defendant." The State made no such objection at trial and fails to respond to the rationale that if the victim is not deceived it logically cannot be maintained the maker of a worthless check received anything "therefor," to use the term employed in § 713.3. The statutory concept of a *quid pro quo* exchange cannot be so easily ignored.

Our recent examination of the above requirement is found in State v. Johnson, supra. Trial court there sustained State's objections to prior no-fund checks given the payee by defendant and paid by defendant's father. Reversing, we said at 196 N.W.2d 571,

"[E]vidence of previous transactions involving checks given by defendant to Garrett was admissible to aid the jury in determining whether Garrett, at the time he accepted the check and parted with things of value, was deceived thereby."

We now hold a defendant cannot be convicted of a § 713.3 offense unless he has deceived or defrauded a victim.

II. So concluding, we must confront the second facet of this issue: whether a payor bank whose responsible employees know a customer has an overdrawn account may be legally deceived when it pays the customer's counter check presented without extrinsic misrepresentations.

There is no factual dispute. State's brief at page 4 concedes, "Evidence presented at trial shows that the victim (bank) knew the appellant did not have sufficient funds in his account at the time he cashed the check at one of their branch offices."

Instead of making the necessary law conclusion, trial court submitted the issue to the jury in instruction 13, patterned after Uniform Instruction 510.5 referred to above. The jury was told the bank must have been defrauded, that if it accepted the check with knowledge defendant had no funds or credit the bank could not have been deceived, and that the knowledge of the bank's agents T. J. Nicholls and Dorothy Uttley was the bank's knowledge.

Defendant's brief drolly observes, "How the jury was able to find Defendant guilty in view of such instruction * * * and Instruction No. 11, astounding though it may be, is testament to the ability of the jury system to rise to every occasion."

■ The State does not deny the knowledge of Mr. Nicholls, the cashier, is legally imputable to the bank. In State v. McCut-

chan, supra, 219 Iowa at 1038, 259 N.W. at 27–28, this court impliedly accepted the concept an employee's knowledge was imputable to the bank under a statute almost identical to § 713.3. The principle was not invoked there because the employee was an aider and abettor in the fraud. See also Mechanicsville T. & S. Bank v. Hawkeye-Security I. Co., 158 N.W.2d 89, 91 (Iowa 1968). But here the long-accepted rule that the knowledge of an officer is the knowledge of the corporation is applicable. See White v. Gutshall, 213 Iowa 401, 405, 238 N.W. 909, 911 (1931); Watt v. German Sav. Bank, 183 Iowa 346, 366, 165 N.W. 897, 902 (1917); Walker v. State, 89 Ga.App. 101, 104, 78 S.E.2d 545, 548 (1953); 3 Am.Jur.2d, Agency § 273, pp. 635–637.

Recourse to that principle in these circumstances leads inexorably to a legal conclusion and not to a fact question for the jury. The bank was not deceived or defrauded. Defendant's motions should have been granted.

III. Our above conclusion is reinforced by failure of the State and this court, after extensive research, to find a single appellate decision affirming a defendant's conviction under a similar statute for writing a counter check against an overdrawn account.

On the other hand, defendant's position is supported both by reason and precedent.

■ Opening a bank account creates a contractual relationship. In re Estate of Stamets, 260 Iowa 93, 98, 148 N.W.2d 468, 471 (1967). It is perfectly legal for a bank to charge an item against a customer's account even though the charge creates an overdraft. Section 554.4401(1), The Code. The result is, as Mr. Nicholls testified, merely an extension of credit to the customer. See Talbot v. First National Bank, 106 Iowa 361, 76 N.W. 726 (1898), aff'd, 185 U.S. 172, 22 S.Ct. 612, 46 L.Ed. 857 (1902).

■ The act is no more a violation of § 713.3 than the situation in which the maker informs the drawee at the time of the transaction he does not then have funds in the payor bank to pay it. See State v. Doudna, 226 Iowa 351, 357, 284 N.W. 113, 116 (1939); People v. Jacobson, 248 Mich. 639, 642–643, 227 N.W. 781, 782 (1929); 32 Am.Jur.2d, False Pretenses § 81, p. 225. The elements of the offense are fixed and are to be determined at time of the transaction, not by a subsequent third-party determination—in this case, Mr. Nicholls' decision, two days later, not to post the check against defendant's account. See State v. Mason, supra at 294–295.

When the Iowa legislature turned its attention to overdrafts, it imposed misdemeanor penalties on bank employees only, regardless of the amount of the item creating the overdrawn account. See §§ 524.-710(2), 524.1601(1), The Code. In the circumstances of this case, we will not assume the legislature intended § 713.3 with its felony provisions for checks of $20 or more to apply to a bank's overdrawing customers, nor do we believe the statutory language requires us to reach that result.

Carrying the State's contentions to a logical end would require us to hold virtually every counter-check transaction against an overdrawn account, whether wittingly or unwittingly made, a prima facie § 713.3 violation. The payor bank would walk a thin line in attempting to collect the overdraft without reporting the alleged offense. See § 722.2, The Code ("Compounding lesser felonies"); Ex Parte Thaggard, 42 Ala.App. 229, 236, 159 So.2d 813, 820 (1963).

The State logically argues that in this day of corporate conglomerates, multiple office banking institutions, and high volume checking transactions, it would not be sound public policy to require a payor bank to make an individual review of each checking transaction occasioned by the presentation of a check for payment by a maker at the payor bank. But this argument should be addressed to the legislature, it being that branch of government constitutionally empowered to define crimes and prescribe punishments.

The result we reach here finds support in the following decisions: Ex Parte Thaggard, supra; Walker v. State, supra; State v. Creachbaum, 24 Ohio App.2d 31, 263 N.E.2d 675 (1970), aff'd, 28 Ohio St.2d 116, 276 N.E.2d 240 (1971); State v. Herman, 162 S.W.2d 873 (Mo.1942); Deitle v. State, 363 S.W.2d 939 (Tex.Crim.App.1963); but cf. State v. Hodges, 5 Or.App. 362, 484 P.2d 1107 (1971).

We reverse and remand with instructions to dismiss the county attorney's information.

Reversed and remanded.

All Justices concur, except UHLEN-HOPP, J., who dissents.

UHLENHOPP, Justice (dissenting).

I have a basic difference with the majority in those false check cases in which a defendant fraudulently induces an innocent agent to part with a principal's money. The court holds that such a defendant does not violate the false check statute if the principal knows or has imputed knowledge that the defendant does not have funds on deposit to cover the check, even though the agent in question is unaware of that fact. In my opinion, the crime is complete when the defrauded agent hands over the principal's money. The principal is not suing the defendant civilly; the State is prosecuting the defendant for committing a fraud, and commit a fraud the defendant did. The object of the false check statute is to deter fraud.

Furthermore, contributory negligence is no defense to fraud. As stated in 32 American Jurisprudence 2d False Pretenses § 53 at 208:

Generally, the guilt of one charged with obtaining money or property by false pretenses does not depend on whether the victim could, with reasonable diligence or ordinary prudence, have ascertained that the representations were false. In other words, one who has made false representations cannot excuse himself by saying that if the victim was sharp, diligent, and astute, he could have detected the fraud by using means of detection available to him.

See also 35 C.J.S. False Pretenses § 37 at 863.

Defendant Mullin drew the check in question on the Peoples Bank, which is the principal in this set of facts. Presumably the court would affirm the present conviction had defendant cashed that check at, say, the First National Bank. Then the commission by defendant of all three elements would admittedly appear: (1) perpetrating fraud (including deception), (2) obtaining money, and (3) knowingly having no funds or arrangement with the Peoples Bank to cover the check.

But defendant cashed the check at the Peoples Bank, or more specifically, at its branch office. The teller Dorothy Uttley who waited on defendant testified that he told her he had an account with the Peoples Bank and worked in the vicinity, that she would not normally ask a person presenting his own check whether he had sufficient funds in his account to cover the check and would not inquire of the main bank unless she had reason to think the person was lying, that she would not have cashed the check had she known defendant did not have funds in his account to cover it, and that she assumed he did have such funds. In fact, defendant only deposited $23.05 in the account altogether, his balance in the account at any one time never exceeded $10, he had nothing in the account at the time of this transaction, and this check was for $45. In my opinion, the crime was complete when defendant got the money from Dorothy Uttley, as the jury found, although the cashier of the bank knew that defendant did not have funds in his account. Had Dorothy Uttley known defendant did not have funds in his account, or had defendant presented the check to the cashier who had such knowledge, we would have a different case.

The rule the majority announces will have far-reaching effects in false check and false pretense cases involving agents. No matter how offensively a person defrauds an agent out of a principal's funds or property, the crime will not be committed if the principal has knowledge or if knowledge is imputed to him, despite the defrauded agent's ignorance of the facts. The rule will not only apply to agents of banks in false check cases but also to agents of other organizations in false pretense cases, if someone else in the organization knows the facts. The rule will drive a large hole in the false check and false pretense statutes in cases involving frauds on agents.

I cannot subscribe to such a rule. It is contrary to the object of the false check statute, § 713.3, and the false pretense statute, § 713.1. It is not required by the language of those statutes, and no amendment to either statute is necessary. I would therefore affirm.