Richmond

## Cynthia A. Warren

v.

## Commonwealth Of Virginia

October 6, 1978.

Record No. 780049

Present: All the Justices.

*Charles S. Cox.,* for appellant.

*Robert H. Anderson, Jr., Assistant Attorney General (Marshall Coleman, Attorney General,* on brief) for appellee.

CARRICO, J., delivered the opinion of the Court.

The principal question involved in this case is whether one can be convicted under Virginia's "Bad Check Law," Code § 18.2-181, of passing to his own bank a worthless check drawn on his account in that bank. Answering the question affirmatively and finding the evidence sufficient to show a violation of the statute, the trial court convicted the defendant, Cynthia A. Warren, of uttering, with intent to defraud, a check in the sum of $324.

The evidence shows that the defendant maintained a checking account in the Burke & Herbert Bank & Trust Co. in the City of Alexandria. On November 5, 1976, the defendant appeared at the bank's Duke Street branch and presented a check for $325, drawn on her account and payable to the order of cash. The teller telephoned the bank's bookkeeping department and ascertained that the defendant had sufficient funds in her account to cover the check. Thereupon, the teller paid the defendant $325 in cash.

On the same date, the defendant appeared at the bank's Landmark branch and presented a check for $324, drawn on her account and payable to the order of cash. The teller called the bookkeeping department and was informed that the defendant did not have sufficient funds to cover the check. When this information was reported to the defendant, she told the teller she had made a deposit the evening before at the Duke Street branch. The teller called Duke Street, verified that a deposit had been made, and, believing that "what [the defendant] had in the bank covered the check," paid the defendant $324 in cash.

The ledger record of the defendant's account showed that, before the two transactions of November 5, she had a balance of $334.43, including a deposit of $100 made November 4. After posting and deduction of the $325 check, the balance was reduced to $9.43. The $324 check was shown on the ledger "as being returned."

Testifying in her own behalf, the defendant admitted that she passed the $325 check, but she denied passing the $324 check; her purported signature on the latter instrument, she said, was a forgery. Furthermore, the defendant insisted that the $325 check was cashed at the Landmark branch rather than, as the Commonwealth's evidence showed, at the Duke Street branch. She maintained that she had no "dealings whatsoever" with the Duke street branch on November 5.

Code § 18.2-181, under which the defendant was convicted, in pertinent part, provides as follows:

> "Any person who, with intent to defraud, shall . . . utter . . . any check . . . upon any bank . . . knowing, at the time of such . . . uttering . . . that the maker or drawer has not sufficient funds in, or credit with, such bank . . . for the payment of such check . . . although no express representation is made in reference thereto, shall be guilty of larceny."

The defendant contends that, as a matter of law, one cannot be convicted under Code § 18.2-181 for cashing at his own bank a worthless check drawn on his account in that bank. In such a situation, the defendant says, the bank customer does not represent that the check is good; he merely requests payment of the instrument. But, the defendant asserts, whether the customer's action in presenting the check amounts to a request for payment or a fraudulent representation, the result is the same. The bank, the defendant maintains, is charged with all the information its records reflect and all the knowledge its officers and employees possess concerning the status of the customer's account. Therefore, the defendant argues, when the bank parts with its money without exercising "ordinary diligence" to ascertan from the "means available" the true status of the account, the bank has not been defrauded by any action of the customer, but has suffered a loss caused by its own negligence.

In her case, the defendant says, it was the "erroneous posted balance information," rather than "any false representation that the check was good," that induced the bank to cash the $324 check in question. Under the circumstances, the defendant asserts, the

bank should have charged the amount of the check against her account, even though the charge created an overdraft, which would have been "both legal and proper" under Code § 8.4-401(1).[1] Therefore, the defendant concludes, she should not have been convicted of violating the "Bad Check Law."

We have not decided previously whether, under the circumstances here presented, a conviction can be sustained under the "Bad Check Law," Code § 18.2-181. The defendant's position, however, does find some support in two cases she cites from other jurisdictions.

In *State* v. *Mullin*, 225 N.W.2d 305 (Iowa 1975), a bank teller cashed a customer's check drawn on his account in the bank. The cashier of the bank knew the customer's account was already overdrawn, and the teller had available, but did not refer to, a list of overdrawn accounts. In reversing the customer's conviction, the court held that the knowledge of the bank's cashier was imputable to the bank and that, in the absence of "extrinsic misrepresentations," a bank legally cannot be deceived when its "responsible employees" know a customer's account is overdrawn. The bank, the court observed, could have charged the check against the customer's account, even though the charge would have created an overdraft, thus resulting in an extension of crédit to the customer.

In *Deitle* v. *State*, 363 S.W.2d 939 (Tex. Crim. App. 1963), a teller, knowng that a customer's account was in a "hold" status, nevertheless cashed his check drawn on the account, after which it was determined that the customer had deposited a worthless check to open the account. The court stated that the "injured party in cases of this nature cannot be defrauded by any representation made of a fact he knows or could have known by the exercise of ordinary prudence in using the means at hand to detect the true condition of the account." 363 S.W.2d at 940. The court reversed the customer's conviction because the teller knew or had the "means at hand" of discovering the true status of the account and, therefore, was not induced to part with the bank's money by any fraudulent representation by the customer.

We express no opinion upon the soundness of the decisions to reverse the convictions in these cases. We do question, however, and disagree with the rationale employed by both courts and with

---

[1] Section 8.4-401(1), part of the Uniform Commercial Code, reads as follows:

"As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft."

the present defendant's argument based upon the same rationale, *viz.*, that a conviction under a bad-check statute is precluded by a bank's failure to exercise "ordinary diligence" to ascertain from the "means available" the true status of a customer's account before cashing his worthless check. This rationale rests upon a concept of contributory negligence on the part of the bank, a concept which is familiar in civil cases but out of place in the criminal setting of the present controversy. *See State* v. *Hodges,* 5 Or. App. 362, 366, 484 P.2d 1107, 1108-09 (1971); *State* v. *Weisengoff,* 85 W.Va. 271, 284, 101 S.E. 450, 456 (1919). While we have held that Virginia's "Bad Check Law" is not violated where the payee accepts a check knowing that it is not then good, with an understanding that it will be paid at some later time, *Hubbard* v. *Commonwealth,* 201 Va. 61, 65, 109 S.E.2d 100, 104 (1959), *Turner* v. *Brenner,* 138 Va. 232, 235-36, 121 S.E. 510, 511 (1924), this view is based not upon a theory of contributory negligence but upon the rationale that the maker does not possess the necessary fraudulent intent when he utters the check under such circumstances.

■ Furthermore, to the extent that the defendant's argument and the decisions in *Mullin* and *Deitle* rely upon the law of agency to impute knowledge to a bank of a customer's overdrawn account, we believe the reliance is misplaced. Where, as here, the particular agent who cashes a check has no knowledge of its worthlessness, although some other employee might know the customer has insufficient funds, the theory of imputed knowledge must work in strange directions--from one agent to principal and back to a different agent--to have the effect urged for by the defendant.

■ Neither do we find persuasive the defendant's argument, suggested by the observation of the *Mullin* court, that a bank's ability to charge a worthless check against a customer's account, even though the charge creates an overdraft, should excuse a bad-check violation. The authority of a Virginia bank to take such action is found in a purely civil statute, Code § 8.4-401(1), *supra* note 1, and, in any event, the authority is discretionary. We fail to see how the refusal of the bank to exercise the authority in the present case could excuse the defendant's actions, if those actions were otherwise criminally actionable under the "Bad Check Law."

██ Under our bad-check statute, the gravamen of the offense is the intent to defraud, and the offense is complete when, with the requisite intent, a person utters a check he knows to be worthless. *Rosser* v. *Commonwealth*, 192 Va. 813, 816-17, 66 S.E.2d 851, 853 (1951). A check is uttered when it is put into circulation; for example, when it is presented for payment. *Bateman* v. *Commonwealth*, 205 Va. 595, 599-600, 139 S.E.2d 102, 106 (1964). The presentment is more than a request for payment; it constitutes an implied representation that the check is good. The statute itself dispenses with proof of an extrinsic representation. *Hubbard* v. *Commonwealth, supra,* 201 Va. at 65, 109 S.E.2d at 104. It need not be shown that the implied representation was relied upon or that anything was received in return for the check; indeed, the discovery by a payee that a check is worthless before a purchase transaction is completed does not preclude a conviction under the statute. *See United States* v. *Sparks,* 560 F.2d 1173 (4th Cir. 1977). And, while we have stated that the statute is "specifically aimed to discourage the giving of bad checks for what purports to be a cash purchase," *Rosser* v. *Commonwealth, supra,* 192 Va. at 816, 66 S.E.2d at 853, such a purchase is not the only transaction proscribed; the statute clearly encompasses a worthless check given to obtain cash.

██ We can perceive no reason that the foregoing principles should not apply to the situation where a customer passes to his own bank a worthless check drawn on his account in that bank. With the proliferation of branch banking, the high volume of checking transactions, and the relative ease with which a person can move from one branch to another, it would be unrealistic to hold that a bank, in order to avoid immunizing a customer from prosecution under the "Bad Check Law," must cash a customer's check at its peril. The alternative would be an on-the-spot individual review of each recent transaction affecting the customer's account to ascertain that, at the moment he presents his check to be cashed, he has sufficient funds to cover the instrument. We do not believe that the "Bad Check Law" should be interpreted so narrowly as to require this extreme alternative; rather, it should be held to apply to the situation here presented.

■ This brings us to the defendant's contention that the evidence was insufficient to sustain her conviction. Here, the defendant repeats much of the argument advanced in support of her first contention, *viz.*, that, as a matter of law, she could not be convicted under the bad-check statute. For the reasons previously assigned, we reject this portion of the argument.

Additionally, the defendant argues that it was not shown whether the $324 check, for which she was prosecuted, or the $325 item, which the bank charged against her account, was negotiated first. Without the statutory presumption created by Code § 18.2-183[2] and in the absence of a showing that the $324 check was negotiated last, the defendant asserts, the evidence was insufficient to show that she possessed the necessary fraudulent intent at the time she negotiated the $324 check.

We believe the evidence was sufficient to sustain the defendant's conviction. She admitted passing the $325 check, and she testified that she knew she had sufficient funds to cover this item, but she said that she also knew the transaction would reduce the balance in her account to "zero." If she also passed the $324 check, as the evidence clearly showed, then she did so with full knowledge that she had insufficient funds to cover the item. Adding to these circumstances the fact, also established by the evidence, that the defendant falsely denied the $324 transaction justifies the conclusion not only that the defendant passed the $324 check with intent to defraud but also that the transaction at each bank branch was part of an overall scheme to defraud, designed with the hope that the cashing of the first check at one branch would not be discovered when the second check was presented at another branch.

Finding no error in the defendant's conviction, we will affirm the judgment of the trial court.

*Affirmed.*

---

[2] Under § 18.2-183, the making or drawing or uttering or delivering of a check, payment of which is refused by the drawee because of lack of funds, shall be prima facie evidence of intent to defraud or of knowledge of insufficient funds unless the check is paid within five days after written notice is given. Apparently, no such notice was given the defendant in the present case.