The appellant was indicted by the Grand Jury of Calhoun County for the offense of rape. At arraignment he entered a written plea of not guilty. A jury found the appellant guilty as charged. The trial court entered judgment accordingly and sentenced appellant to a term of fifteen years in the penitentiary. Appellant was represented by court-appointed counsel at all proceedings in the trial court, and is so represented in this court by same counsel.
This was the second trial for the appellant on this offense. A mistrial was declared by the trial court at the conclusion of the first trial when the jury was unable to agree on a verdict.
The appellant challenged the sufficiency of the evidence by filing a written motion to exclude the evidence at the close of the State's evidence and again at the conclusion of the defense evidence.
According to the State's evidence the prosecutrix was employed as a waitress for the Alley Restaurant and Lounge in Anniston, Alabama at the time of this offense. Jim Kaufmann, who had dated the prosecutrix several times, was the drummer for the musical group playing at the Alley Lounge. Shortly after the 12:00 midnight closing time of the Alley, on March 12, 1978, the prosecutrix asked Mr. Kaufmann if he would like to go smoke some marijuana. As Mr. Kaufmann and the prosecutrix were leaving through the back entrance to the Alley, they were stopped by the appellant in the parking lot. The prosecutrix continued on to Mr. Kaufmann's panel truck parked next to her automobile. The appellant, a friend of Mr. Kaufmann, asked him if they wanted to go to breakfast. Mr. Kaufmann declined but asked the appellant to come along with him and the prosecutrix. Mr. Kaufmann testified he asked the appellant to come along with him because, I thought Floyd (the appellant) was drunk and I didn't want to go with him."
All three left the Alley in Kaufmann's panel truck with Kaufmann driving, the prosecutrix in the passenger seat, and appellant sitting on a cushion or tire to the middle rear of them. The appellant suggested they go to a wooded area near Jacksonville called Bald Rock to smoke the marijuana.
The prosecutrix was the only one of the three to take along any alcoholic beverage. She had a half filled glass of bourbon and coke.
Upon arriving at Bald Rock they smoked the only two "joints" of marijuana the prosecutrix had. Kaufmann stated that the appellant was "kind of incoherent" while at Bald Rock. *Page 655 
While they were smoking the second "joint" the victim stepped outside and to the rear of the truck to urinate. She was wearing a one piece jumpsuit and had to unzip and take the top off. This particular area was dark with no lighting. No one else got out of the truck.
After spending about thirty minutes at Bald Rock they headed back to the Alley, stopping only at a convenience store to obtain some grapefruit juice for the prosecutrix. There had been no sexual contact between either of the three at Bald Rock.
As they arrived back at the Alley parking lot, Mr. Kaufmann pulled the truck up to the prosecutrix's automobile. The appellant exited the truck and got into his car. Kaufmann and the prosecutrix sat and talked in the truck for a few minutes. The prosecutrix then got into her car and Kaufmann drove off. As Kaufmann drove off he noticed the appellant was sitting in his car in the corner of the parking lot.
The prosecutrix testified that as she came out of the parking lot and turned right onto 12th Street she saw the appellant come out from the back of the Alley and turn left onto 12th Street. As they passed each other going in opposite directions the prosecutrix threw up her hand and waved to the appellant. The appellant made a U-turn and started following her. She took a left turn onto Quintard, a four-lane highway, and remained in the left lane. The appellant pulled up beside her in the right lane and started honking his horn. She testified:
 "He started blowing the horn and I kept driving and he kept blowing the horn and I pushed the button and raised the window down and asked him what he wanted. He told me to pull over and I told him I couldn't I had to go home. So I went on, went a little faster, and he kept going faster and he kept blowing the horn and I kept going and the window was still down. He said for me to pull over, he had something important to tell me, to talk to me about. I kept going and I went — well, he was right even with me. I was going pretty fast trying to get home and we topped the hill right there below K-Mart, right there on the hill, and he told me to pull over in K-Mart parking lot and I told him no, and I kept going."
They continued past K-Mart and approached the Highway 431 turnoff to Gadsden where she was intending to turn left for home. The appellant was still blowing his horn. She stated:
 "Well, I had pushed the gas a little bit faster and he was going real fast right around even with me because he was in the right lane and he blowed the horn and told me just to pull over. And he wanted to tell me something and so I pulled — my house was about a block away and I pulled over at Five Points."
Five Points was an area of several stores. The prosecutrix later testified she stopped for him because she did not want him to follow her home and know where she lived. She also thought he wanted to tell her something about Jim Kaufmann.
The appellant pulled in the Five Points area behind the prosecutrix and parked straight in. She turned and backed in to align her driver's window with his driver's window so he would not have to get out of his automobile. At this point things began to happen fast. The appellant walked over and reached through the half opened window, unlocked the door, and opened it. She further testified:
 "He told me to move over and I wouldn't move over and so he started pushing me over and I was pushing him back, telling him he wasn't going to get in, if he had to talk to me, to talk me (sic). He kept pushing on me and he was using his knees and I was pushing back and then he was using his whole body and kind of sitting on my shoulders pushing me over and I was pushing back at him. He pushed real hard and I went over — fell over sideways in the seat and at the same time he pushed me over. At the same time he pushed me over, I grabbed the keys out of the ignition."
They wrestled over the keys and he jerked them away slightly cutting or scratching her hand in the process. The prosecutrix *Page 656 
screamed and he hit her in the mouth causing "a little puffiness and a small cut." The appellant then attempted to crank the automobile. She continued to wrestle with him in an attempt to turn the ignition off. The appellant told the prosecutrix "if I screamed again he was going to run the car into the G.D. wall." She then stated:
 "Well, I just sat there for a little. I was kind of seared. I thought he would just sit there and talk and he got the keys and started toward the ignition, and when he started to crank it, I turned it off and he turned it on and I'd turn it off. Then he slung back his arms and he pushed me back and he had the car cranked and when he put it in gear he was mashing the gas and I was mashing and kicking his feet to hit the brakes and he told me to settle back or I was going to get hurt."
The prosecutrix estimated the time was about 2:00 a.m. when the above took place. She testified that while this incident was happening a Volkswagen pulled up, someone put newspapers in a paper box, and then drove off. She did not try to attract his attention as she was afraid.
The appellant drove them back toward town in her mother's automobile. Because she was not certain he was familiar with the area she tried to give him directions that would take them back to the Saks area near her home. When that didn't work she kept trying to talk him into taking her back.
The appellant finally pulled into Edgemont Cemetery. This was an area with very little light behind a garage and near a junkyard. The prosecutrix testified that, "He turned the car off and he turned the emergency flashers on, and I turned them off by instinct. I don't know why I done it at the time, but I just did it." The appellant began making sexual advances at the prosecutrix. When she resisted the advances, he pushed her down in the seat. He started pulling her jacket off and partially unzipped her one-piece outfit. She tried to pull the zipper back up. Appellant threatened to hurt the prosecutrix if she continued to resist. The victim testified, "Well, I was scared. I wasn't really fighting. I was just trying — I wasn't going along with it, you know, but I was scared."
The appellant ordered the prosecutrix to take her clothes off and he assisted her in doing so. He then performed an act of oral sex on the prosecutrix followed by an act of sexual intercourse. She testified:
 "I was starting to cry some. I was still laid back. I had my arm in the seat and the other one was on the side of me and he told me to put my arms around him, and I wouldn't do it. He said, `Put your G.D. arms around me', and I just laid it on top of his back. I didn't hug him; I just laid it there."
The prosecutrix testified she did not consent to the sexual acts.
When appellant finished he wanted to sit and talk for a while. Because of the prosecutrix's fear at this time she told the appellant she would give him her phone number and she would not tell "Jim Kaufmann or anybody else about" this incident. She also told him she enjoyed the sexual act to appease him, i.e., "just anything to take me back to the car."
The appellant finally took her back to her automobile at Five Points. This was at approximately 3:00 a.m. She drove directly home and entered the back door of her residence. She went directly to the bathroom, removed her clothes and washed.
The prosecutrix then entered the bedroom she shared with her sister, Sheila Davidson Beal, lit a candle, sat on the edge of the bed, and began crying. Her sister was awakened by the crying. She told her sister what had happened. Her mother and Mrs. Elaine Gibson took her to the doctor approximately twenty minutes after she arrived home.
Mrs. Elaine Gibson testified she slept on a sofa at the prosecutrix's house on the night in question. She was awakened by the sound of the back door opening at approximately 3:00 a.m. Approximately fifteen or twenty minutes later she heard voices and got up off the sofa to investigate. She then saw the prosecutrix. "I noticed that she *Page 657 
had a puffy lip and that there was a cut on her lip and I asked her what happened. She was quite upset, she was crying." She then took her to the hospital.
Sheila Davidson Beal testified that she saw her sister in the bedroom they shared at about 3:00 a.m., on the morning in question. The prosecutrix was sitting on the bed, upset and crying. Mrs. Beal testified that "she told me that she had been raped."
The testimony of the appellant was in sharp conflict with the State's evidence. Appellant testified that the prosecutrix, Jim Kaufmann, and he had smoked two "joints" at Bald Mountain near Jacksonville. He testified he had a few drinks that night but he "wasn't real drunk . . . Just a little tipsy." Appellant stated that while at Bald Mountain the prosecutrix got out of the truck. He saw and heard her "use the restroom."
The conflict in the testimony appears when both appellant and the victim were leaving the parking lot at the Alley. As he passed her going the opposite way, she blew the horn at him and waved to get him to follow her. He turned around and followed. He blew his horn at her several times and she would throw her hand up and motion. He hollered out the car window and asked what she wanted. She never answered, just motioned. She finally pulled in at the House of Chen. She backed her automobile up and he pulled straight in. Appellant got out of his automobile and stood at her car door talking for about five or ten minutes. The victim asked him to go smoke a "joint" so he "opened the door and slid in." Sex was never brought up in the conversation. He denied that he forced his way in her automobile, that he hit her in the mouth, that he cut her hand with a key, or that she ever screamed. He was already in her car when the paperman pulled up. This was "a minute or two" after she and he arrived.
Appellant testified they did argue over who was going to drive and he won the argument. He drove them to an area behind Puls garage where he used to work in the body shop. He parked on or near a road and turned his flashing lights on in order to guard against anyone coming down the road running into them. He inferred she turned the flashing lights off because she didn't want to get caught smoking marijuana. She never told him to take her back to Five Points.
They smoked a "joint" there. After that "we sat there and she slid over beside me and we was sort of making out and all." He never thought about having sex with her until she slid over next to him. The appellant proceeded to have sexual intercourse with her. He testified she never resisted or cried, and that she responded to him. He denied making any threats or that he had oral sex with her. She told him she enjoyed their act of sex. The prosecutrix also told him not to tell Jim Kaufmann.
In order to support a prima facie case of rape the following elements must be shown: (1) Carnal knowledge, (2) committed forcibly, and (3) without consent. § 13-1-131, Code of Alabama 1975. In this case the act of sexual intercourse was admitted by the appellant. He contends the act was committed without force and with consent.
In determining whether the State presented a prima facie case we are required to take the evidence in its most favorable light for the prosecution. Renfroe v. State, Ala.Cr.App.,382 So.2d 627, cert. denied, Ala., 382 So.2d 632 (1980). The evidence for the State revealed the following pertinent facts:
 1. The appellant physically forced his way into the prosecutrix's automobile.
2. The appellant hit the prosecutrix in the mouth.
 3. The appellant jerked the prosecutrix's automobile key away cutting or scratching her hand in the process.
 4. The appellant drove the prosecutrix away in her automobile against her will. *Page 658 
 5. The appellant sexually ravished the prosecutrix against her consent and resistance.
 6. The appellant threatened the prosecutrix with bodily harm.
 7. The prosecutrix was continually fearful and afraid of the appellant.
The trial record is replete with testimony for the State that the appellant committed an unlawful carnal knowledge upon the prosecutrix forcibly and without her consent. A prima facie case was presented. Struggs v. State, Ala.Cr.App.,372 So.2d 49, cert. denied, Ala., 372 So.2d 55 (1979); Collins v. State, Ala.Cr.App., 364 So.2d 368, cert. denied, Ala., 364 So.2d 374
(1978). Even though the evidence was in sharp conflict the trial court correctly presented the issue of the appellant's guilt or innocence to the jury. As stated in Gilmore v. State, Ala.Cr.App., 358 So.2d 501, 503 (1978):
 "Where the evidence is contradictory, a jury question is presented. The jury may believe or disbelieve all or any part of the testimony presented by either side. Harris v. State, Ala.Cr.App., 333 So.2d 871
(1976); Williams v. State, 51 Ala. App. 1, 282 So.2d 349, cert. denied 291 Ala. 803, 282 So.2d 355."
As this court stated in Williams, supra:
 "`The fact that essentially all of the evidence against the appellant was from the testimony of the prosecutrix does not vitiate the conviction. A jury that will believe the uncorroborated testimony of the prosecutrix, beyond a reasonable doubt, can convict a defendant of rape, Barnett v. State, 83 Ala. 40, 3 So. 612, or of any lesser included offense. Title 14, Section 42, Code of Alabama 1940; Kelsoe v. State, [50 Ala. App. 378, 279 So.2d 549, cert. den., 291 Ala. 786, 279 So.2d 552] supra, and authorities therein cited.'"
The appellant next contends the trial court erroneously admitted testimony of the prosecutrix's sister concerning the complaint made by the prosecutrix. Mrs. Beal testified that she was awakened in her bedroom by the crying of the prosecutrix. The following testimony then occurred:
Direct Examination by Mr. Hubbard:
"Q. Did she tell you what had happened to her?
"A. Told me she was raped.
"THE COURT: That's not his question.
 "MR. PARKS: It got out. We ask that it be stricken and that they be instructed to disregard it.
"MR. HUBBARD: Judge, if I might argue the point —
"MR. PARKS: Not in the presence of that Jury . . .
 "THE COURT: Just a moment. Her answer was not in response to the question. I'll sustain the objection and instruct the Jury that the last part of this witness' answer was not proper, that is she didn't answer the question that was asked and as such I'm instructing you as members of the Jury to disregard that last statement that was made. You are to exclude it from your minds, totally exclude it from your consideration in the case. I'm going to ask you can do that (sic). I'm going to do it this way; I'm going to say is there any member of the Jury that cannot exclude that from your consideration in the case, to raise your hand. Let the record show that there are no hands raised.
 "All right, we'll proceed. Just answer the very specific question that is asked of you.
"MR. HUBBARD: Your Honor, may we approach the bench?
"THE COURT: All right."
A hearing was then held out of the jury's presence on this issue. After hearing arguments the trial court made the following ruling:
 "The Court is going to allow the present witness Sheila Davidson Beal to testify for purposes of corroboration that her sister made a complaint to her, I take it, to the effect saying that the alleged victim had been raped. I'm not going to allow her to go any further than that or into any of the details or as to the identity *Page 659 
of the alleged perpetrator thereof. Mr. Parks."
Direct examination then continued in the presence of the jury. From the record:
"BY MR. HUBBARD:
 "Q. Mrs. Beal, when you saw your sister, I believe you said you saw her crying there in the bedroom; is that correct?
"A. Yes, sir.
 "Q. Now, then, did she make any statement as to what had happened or what was wrong with her?
"A. Yes, sir.
 "Q. Tell the Ladies and Gentlemen of the Jury, if you would, what she told you had happened to her.
"A. She told me that she had been raped."
No particulars of the complaint were testified to.
In Waters v. State, 55 Ala. App. 646, 318 So.2d 342, 345, cert. denied, 294 Ala. 773, 318 So.2d 346 (1975), it is stated:
 "The State may on direct examination of the prosecutrix prove the bare fact that she made immediate complaint of being raped and when and to whom, and she may be corroborated by the person or persons to whom she complained as to the same fact." (citations omitted)
The appellant claims in brief this proposition of law has no application in this case because the prosecutrix "testified to no complaint per se."
The following testimony occurred on direct examination of the prosecutrix by the State concerning what occurred after the prosecutrix entered the bedroom she shared with her sister:
"Q. Does anybody share that room with you?
"A. Yes, sir, my sister.
"Q. What is her name?
"A. Sheila Davidson — Beal, now.
"A. That's the one a year younger than you?
"A. Yes, sir.
"Q. Did you tell her about this incident?
"A. Not at first. She woke up —
MR. PARKS: I've got no objection so far.
 "Q. Let me ask you this first. Was she up there in the room?
"A. No, sir.
 "Q. What — How did she get up, if she did? Did you wake her?
 "A. I didn't wake her. I was crying and she woke up and heard me crying.
 "Q. Did you tell her at that time anything had happened?
"A. Yes.
"Q. Did you tell anybody else there in the household?
"A. Not at that time."
We believe the plain meaning of the prosecutrix's testimony to be such that ordinary reasonable jurors could infer the prosecutrix told her sister she had been raped.
In addition, her sister was the first person she spoke to after the incident and the statement took place less than twenty minutes after the prosecutrix arrived home. We find in Gamble, McElroy's Alabama Evidence, § 178.01 (3rd Ed. 1977): "Complaints . . . may be testified to either by the victim or
by other third party witnesses." It was proper to receive the prosecutrix's sister's testimony as proof of the fact that the prosecutrix did make the complaint of rape. Price v. State,41 Ala. App. 239, 128 So.2d 109 (1961).
Lastly the appellant complains the trial court erroneously permitted the State's witness Mrs. Elaine Gibson to testify as to the prosecutrix's appearance after she arrived home, i.e., "I noticed she had a puffy lip and that there was a cut on her lip and I asked her what happened." This testimony was made as the result of the personal observation of the prosecutrix by Mrs. Gibson soon after the incident occurred. There is no testimony here that the prosecutrix made complaint of rape to Mrs. Gibson. This was corroborative of the testimony by *Page 660 
the prosecutrix that the appellant had hit her in the mouth. See: Collins v. State, Ala.Cr.App., 365 So.2d 113, cert. denied, Ala., 365 So.2d 113, cert. denied, Ala., 365 So.2d 116
(1978). It is competent evidence to show the sign of injury on the person of the prosecutrix. Malloy v. State, 209 Ala. 219,96 So. 57 (1923); Scott v. State, 48 Ala. 420 (1872).
We have carefully searched the record for errors injuriously affecting the substantial rights of the appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur. *Page 966