Vicky J. Yeager was convicted for theft of property in the first degree, sentenced to twenty years' imprisonment, and ordered to pay restitution in the amount of $94,000.
 I
The defendant argues that the evidence is insufficient to support her conviction.
The indictment charged the defendant with theft by deception in that she
 "did knowingly obtain, by deception, control over money, the property of D.E. Ponder, Jr., of the value of, to-wit: $147,000.00, with the intent to deprive the owner of said property, by representing to the said D.E. Ponder, Jr. that she had purchase orders for $147,000.00, of Amagift Albums from West Point Pepperell, said representation being false, in violation of § 13A-8-3 of the Code of Alabama."
In February of 1981, the defendant approached Dan Ponder, Jr. with a business proposition. She represented that she was an Amway Distributor and that she had conceived a novel plan to market Amway Amagift Albums to businesses. Because Amway required payment for the products prior to delivery, the defendant asked Ponder to advance her the $1200 she needed to purchase the products. In return she promised him a $600 profit from the sale of *Page 1262 
the product to the business. Ponder advanced her $1200 and within several days, the defendant fulfilled the agreement and paid $1800 to Ponder.
By September of 1982, Ponder and the defendant had conducted forty-four similar transactions which had been financed by conventional loans. After that, the transactions were evidenced by joint venture agreements. Between February of 1981 and July of 1983, Ponder and the defendant had engaged in 120 business transactions.
The subject of the indictment was joint venture agreement Number 121 entered into on July 21, 1983. In this agreement, the defendant represented that West Point Pepperell had ordered 12,100 Amagift Albums for a total purchase price of $286,524.37, and that she required $94,000 in order to complete her order of the albums. Attached to the joint venture agreement was a purchase order from West Point Pepperell.
Under the agreement, Ponder agreed to contribute the $94,000 so that the defendant could "fulfill the order and complete the sale." In return, Ponder would receive $141,000 ($94,000 investment plus $47,000 profit) to be paid in three equal installments. As security for the investment the defendant assigned her rights in the inventory and the proceeds of the sale.
On July 26, 1983, Ponder borrowed $94,000 from the Commercial Bank in Georgia, deposited it in his own bank account and on July 29, 1983, wired $147,000 to the defendant who was doing business as Southeastern Horizons in Dothan, Alabama. Included in this $147,000 was the $94,000 for the West Point Pepperell transaction.
Customarily, Ponder financed the transaction by a "roll over" arrangement. "[W]hat I was doing was rolling the profit and the principal or whatever payment she had to meet into a new deal." Ponder's personal accountant, Paul D. Fields, Jr., described the situation:
 "It was a rollover situation. He was merely taking the profit or being told he was getting certain profits on a transaction. And, when those profits and the principal were to be paid to him, there was other transactions that these monies were rolled over into rather than going through a burdensome paper trail of writing checks back and forth. So, he normally rolled over the profit."
However, the West Point Pepperell transaction was a "cash" arrangement. Ponder testified that he "went to the bank, borrowed ninety-four thousand dollars to go specifically against West Point Pepperell and specifically give [sic] her cash, not rollover, for that."
The State proved that the purchase order attached to joint venture agreement number 121 was false, that the printed form was not the purchase order form used by West Point Pepperell, and that William A. Lane, the Director of General Purchasing for West Point Pepperell, had not signed the order, had not agreed with the defendant or anyone else to purchase Amagifts Catalogues, and had not done any business with the defendant or Southeastern Horizons.
Between 1981 and July of 1984, when the fraud was discovered, Ponder "personally transferred" 2.8 million dollars and received $800,000 from the defendant. The record does not show where the defendant obtained the substantial sums of money she paid Ponder and the other investors on some of the transactions or what she did with the millions of dollars she received.
The defendant contends that the State failed to present a prima facie case because: (A) There was insufficient evidence that any property was transferred to the defendant in reliance on or pursuant to joint venture agreement number 121; (B) there was insufficient evidence to show that Ponder's reliance on the defendant's representation was reasonable because a reasonably prudent businessman, under like and similar circumstances, would not have relied on the representations made by the defendant; and (C) there was a fatal variance between the indictment alleging the theft of "money" and the proof of a "wire transfer." *Page 1263 
 A.
In support of this argument, the defendant cites Ponder's testimony that "[t]here is considerable doubt that the money I wired [the $147,000] was to go to West Point Pepperell. * * * I can not specifically tell [the jury what the $147,000 was for]. * * * I really just don't know [how much money I owed the defendant on the West Point Pepperell deal]. I mean I agreed to advance her $94,000.00. And it is my assumation that that is what I did. I could only assume. I cannot tell you beyond that."
These quoted portions of Ponder's testimony are taken out of context. At one point during the time these statements were made, Ponder stated to defense counsel, "You lost me." Even if Ponder were not confused in the portions of his testimony cited by the defendant, other portions of his testimony reflect that he did transfer money to the defendant in reliance upon her representations. Ponder testified that he "thought" the purchase order was good; that the $94,000 "[i]n this particular transaction, it represented cash," that he "relied" on the purchase order; that he would not have given her the $94,000 "without that representation and purchase order"; that he was not aware that "these purchase orders were fraudulent or forgeries"; that he "just came to trust her more and more"; that "[t]here was absolutely never a question in my mind that they [purchase orders] were not valid"; and that he specifically gave the defendant "cash, not rollover," for the West Point Pepperell transaction: "I specifically remember even though there were a lot of joint ventures surrounding this, that the cash was to go for the West Point Pepperell deal. * * * On July 29, when I wired her the money, ninety-four thousand dollars [of] that was for that particular deal." Some of the confusion appears to be generated by the fact that Ponder testified that he could not state that the same $94,000 he borrowed from the bank was used to pay the defendant on the West Point Pepperell transaction:
 "My obligation to Yeager was not to get ninety-four thousand dollars from the bank and put them in a box and save it and give it to her. My obligation was to furnish her ninety-four thousand dollars on Friday. . . . And, when Friday came, I wired her one hundred and forty-seven thousand dollars. Of which ninety-four thousand dollars was to go against that contract and the balance of which was to go to various contracts that I don't, I cannot tell you specifically which contracts, because we did not go into depth."
Even if Ponder actually did contradict himself at trial, the evidence was sufficient to go to the jury because the State presented a prima facie case. "The effect of contradictory and inconsistent statements goes to the credibility of the witness and is a question for the jury." Magro v. State, 384 So.2d 871,874 (Ala.Cr.App.), cert. denied, Ex parte Magro, 384 So.2d 875
(Ala. 1980). " '[A] jury may believe part of the evidence of a witness and reject part.' . . . 'Inconsistencies and contradictions in the testimony of a witness do not make it inherently improbable.' . . . 'The inconsistencies may impair the credibility of the witness and reduce the weight of the testimony, but they do not destroy the probative force of the testimony as a matter of law.' Jones v. State, 469 So.2d 713,716-17 (Ala.Cr.App. 1985).
 B.
The defendant also argues that the evidence does not support her conviction because Ponder's reliance on her representations was unreasonable.
The legal principles involved in this issue are discussed in Part II of this opinion. Under the particular and peculiar circumstances of this case, we find that the misrepresentations were such that Ponder acted as a reasonably prudent person who exercised ordinary care.
Ponder, the victim, did not avail himself of the means of detecting the falsity of the defendant's representations because of representations made by the defendant. Ponder testified that he "checked out" the defendant's scheme and determined that it *Page 1264 
was possible. However, he kept it confidential at her request:
 "[She said] there was no reason that any other Amway person who became aware of it, there was no reason why they couldn't do the same thing. And therefore, didn't need to tell anybody, because there was no reason they couldn't do the same thing."
He did not telephone the purchasing agent at West Point Pepperell and verify the purchase order "[b]ecause of the tremendous amount of secrecy Yeager had told me was essential to the continuation of this deal." Ponder testified that the defendant placed a "tremendous amount of importance . . . on the secrecy. And the sensitive nature of the transactions with the company." Ponder testified:
 "For instance, one company that she had told me she was very close to making a sale was Republic Bank in Dallas. At the last minute, she said she lost that sale because someone in the bank who realized that they were fixing to pay one hundred thousand dollars purchase or whatever, a large purchase, realized that his secretary or his wife would do the same thing. So, why pay Yeager the profit? Hey, I will let my wife or secretary do it. And, she came back and said this is an example of the secrecy problem. We don't want the people in the company to necessarily know, because there was no reason why Bill Lane, if he started getting ___ because, there was no reason to arouse his suspicion that hey, I can do this myself. And, the secrecy thing was played over and over."
* * * * * *
 "And, you know, she kind of really hit hard. You know, that is very important. Because, the person that I heard it from could do the same sale myself or for herself. But, you know, we've got a niche. We are able to sell these to companies, but anybody can do it. So, it is important that we not tell anybody."
Ponder further stated:
 "And, there were other instances where the secrecy was just hit over and over.
 And, I discussed this secrecy with Paul Fields, my accountant, with Larry Bolden, with my attorney. And, it was, I mean we discussed it over and over. And we all concluded that it was a legitimate reason for the secrecy."
Not only did Ponder discuss the secrecy with his accountant, his financial advisor, and his attorney, who was a partner in one of Alabama's largest and most prestigious law firms, but each of these men personally invested in this venture. Even Ponder's family and relatives invested heavily. Ponder testified:
 "[W]ell, no attorney said don't check out the purchase orders. But my attorneys were familiar with it, were aware of it, were comfortable with it and were comfortable enough to put some of their own money in it."
* * * * * *
 "Like I said, to me, when an attorney says you know, this is a great deal you have got going and I want to put fifty thousand dollars in it, that is about as much assurance as you can get from an attorney that everything is all right."
When Ponder's personal finances became strained to the point where he could no longer finance the defendant, Larry Bolden, who was in the general insurance and investment financing business and who was Ponder's financial advisor (and who also advised the defendant about "several investment opportunities"), formed Main Place Financial Corp., which consisted of himself and the members of his financial firm (Roger Faulk, Doug Perreault, Jim Thomas, and Allen Wallace). Faulk, Perreault, and Bolden also formed the general partnership of LRD and the Houston Financial Group (Bolden, Wallace, Thomas). These companies were formed because Ponder and his family "were not able to continue to fund the requirements of the business." Through these partnerships "probably" $1,680,000 was advanced to Ponder with the understanding that the investors were "buying an interest in his *Page 1265 
[Ponder's] receivables or in the money that he [Ponder] was owed from Ms. Yeager."
Bolden testified that he and Ponder "discussed the fact that . . . he [Ponder] was not in a position to verify those [purchase orders] based on his relationship with her, his agreement with her."
Bolden's firm formed the limited partnership for the purpose of allowing a small number of investors to invest in that limited partnership. LRD would then invest funds with Main Place, which was a joint venture arrangement with Ponder.
 "Houston Financial Group was a limited partnership which was formed to receive capital or funds to advance to Main Place Financial Group. And then Main Place Financial Group actually advanced those funds to Mr. Ponder."
The Houston Group got its funds from investors. Bolden testified that those investors were not informed that they were investing in the financial arrangement between Ponder and the defendant "[b]ecause it was basically our agreement with Mr. Ponder, due to his confidential relationship with Ms. Yeager and the secrecy she required in the, in her dealings with him, that for him to receive funds from outside, those people would not be able to know who was involved."
Main Place was created because "[t]he investors were not able to know who Dan Ponder was. And, we had to have an entity of Main Place between Houston and Mr. Ponder." Bolden invested $95,000 of his own money in Ponder's financial ventures with the defendant.
Paul D. Fields, Jr. was Ponder's personal accountant. He also invested in Ponder's arrangement with the defendant. He brought two other investors into the deal, those being John Brice and another individual who is one of the wealthiest industrial magnates in the State of Alabama. Fields testified he and Ponder discussed the possibility of "checking out" the purchase orders but that "it was not possible, because of the secrecy that was required." He further testified: "This was a transaction that Dan had with Ms. Yeager, that this was a secrecy agreement or secrecy promise that Dan had with Ms. Yeager. For him to have called without her knowledge, would have violated the secrecy agreement." Before the industrial magnate put a "five million dollar line of credit in this deal," Paul told him that "these parties that you are dealing with had sworn each other to secrecy so that the man putting up the money couldn't check behind to determine whether a single one of these transactions were valid."
Under the circumstances, we are not willing to find that Ponder's reliance was unreasonable. We make this finding despite and after considering the testimony of Nathaniel Eubanks, the certified public accountant who amended Ponder's 1981 income tax return. Eubanks testified that, in August of 1982, he told Ponder that the rate of interest on the return of his loans to the defendant was usurious and that "because of the return, that he should proceed very cautiously. That it was very unusual and the rates of return were just too high for it to be true." Eubanks told Ponder that "he just needed to proceed cautiously and take every precaution that he could to insure it was true." Ponder did take Eubanks' advice to the extent that he "changed the nature of his business transactions" with the defendant after he consulted with the lawyer recommended by Eubanks and began using the joint venture agreements instead of the consumer notes previously used.
 C.
Finally, there was no fatal variance between the indictment alleging the theft of "money" and proof of a "wire transfer." The indictment did not allege the theft of lawful currency. There was no violation of the rule of Ex parte Airhart,477 So.2d 979 (Ala. 1985), that evidence that the defendant established unauthorized control over bank checks was at fatal variance with an indictment charging the theft of "lawful currency" because there is a material distinction *Page 1266 
"between a bank check and a federal reserve note."
Alice Speer, the senior vice president of the Commercial State Bank in Donalsonville, Georgia, testified that the bank records show that, on July 29th, "Dan Ponder wired to Vicky Yeager, a total of one hundred and forty-seven thousand dollars." She stated that, "A wire transfer, if you want money to get to another bank today, the bank can wire it through the wire to our corresponding bank in Atlanta and they will wire it to the bank in Dothan or Montgomery or wherever Mr. Ponder wanted it."
"[O]ur Alabama case law is clear that there must be amaterial variance between indictment and proof before a conviction will be overturned for that reason." Ex parteCollins, 385 So.2d 1005, 1009 (Ala. 1980) (emphasis in original). "The law of this state is well settled that '[t]here is no material variance where there is proof of so much of an indictment as shows the defendant committed a substantial offense specified therein.' " House v. State, 380 So.2d 940,943 (Ala. 1979).
Under the circumstances of this case, we find no material variance between an indictment involving the theft of "money, the property of D.E. Ponder, Jr., of the value of, to-wit: $147,000.00" and evidence proving that Ponder "wired" $147,000 to the defendant. The defendant did not gain control over the "wire" but control over the money which was removed from Ponder's bank account and placed in the defendant's through an accepted banking procedure.
In holding that there was no fatal variance between an indictment alleging the receipt of "money" and the evidence showing that the defendant obtained a deposit slip from the bank and checked out the money the next day, our Supreme Court held:
 "And as a practical proposition the deposit slip is the mere instrumentality through which the depositor acquires the use of the money.
 "Indeed in City National Bank v. Burns, 68 Ala. 267, 44 Am.Rep. 138, the holding was that the act of the bank in crediting a depositor with the amount of a check drawn upon it by another customer, is 'equivalent to a payment in money'.
 "It would be carrying technicality to a most regrettable extreme to hold that the proof of the mere instrumentality of obtaining the money constitutes a variance with the charge of obtaining the money itself, when the same evidence discloses the fact that the money was so obtained. Counsel for defendant lays stress upon two decisions of this Court."
* * * * * *
 "Courts are established for practical purposes and should function with a practical end in view. One of the outstanding values of a bank is the matter of safety to the depositor of his money, and, of course, the 'deposit slip' but evidences the fact, for all practical purposes, that the depositor has so much funds in the bank subject to immediate use.
 "It was, in the instant case, merely the instrumentality through which the defendant received his money, and to hold a fatal variance in such a case would run counter to common sense and tend to frustrate the practical end, for the accomplishment of which courts were established." Simmons v. State, 242 Ala. 105, 106, 4 So.2d 905
(1941).
In reviewing the sufficiency of the evidence issues presented, we have applied well accepted principles of appellate review. "In determining whether the State presented a prima facie case we are required to take the evidence in its most favorable light for the prosecution." Smelcher v. State,385 So.2d 653, 657 (Ala.Cr.App. 1980). "[A]ll reasonable inferences and credibility choices must be made in favor of the jury verdict." United States v. Brand, 775 F.2d 1460, 1466
(11th Cir. 1985). "In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and *Page 1267 
consider the evidence in the light most favorable to the prosecution." Faircloth v. State, 471 So.2d 485, 489
(Ala.Cr.App. 1984), affirmed, Ex parte Faircloth, 471 So.2d 493
(Ala. 1985). "Conflicting evidence always presents a jury question unless the evidence palpably fails to establish a prima facie case." Waddle v. State, 473 So.2d 580, 582
(Ala.Cr.App. 1985). A claimed conflict between the testimony of the State's own witnesses is for the jury to reconcile, and to reject, if need be, that part of the testimony which they deem unworthy of belief. Fuller v. State, 45 Ala. App. 133, 135,226 So.2d 677 (1969).
Considering the evidence presented and the defendant's arguments, we find the evidence sufficient to sustain and support the verdict of the jury.
 II
The trial judge properly refused defendant's requested charges number 23 and 24. Those charges were:
 "REQUESTED JURY CHARGE NO. 23 "Ladies and Gentlemen of the jury I charge you that if you believe from the evidence that Dan E. Ponder, Jr., had prior knowledge of the falsity of the representations made by Vicky Yeager, if she did make representations, or if a reasonably prudent person who exercised ordinary care would have discovered the true facts, you should find Vicky Yeager not guilty. (86 So.2d 418)"
 "REQUESTED JURY CHARGE NO. 24 "Ladies and Gentlemen of the jury I charge you that if you believe from the evidence that Dan E. Ponder, Jr., had prior knowledge of the falsity of representations made by Vicky Yeager, if she did make representations, or if the circumstances surrounding the pronouncement of these representations would have aroused suspicion as to its validity in the mind of a reasonable person, he cannot be said to have reasonably relied and you should find Vicky Yeager not guilty. (393 So.2d 1016)"
Next to each charge, the trial judge had written "no evidence of this" and had underlined the words "prior knowledge of the falsity" in each charge.
These two requested charges were properly refused because they authorized the jury to conclude, as an alternative factual finding, that Ponder had prior knowledge of the falsity of any representation made by the defendant when there was absolutely no evidence that Ponder had such prior knowledge. "Where a charge states several distinct propositions of law, the court may properly refuse all if any one of them is unsound."Gaston v. State, 359 So.2d 1170, 1171 (Ala.Cr.App. 1978). Where a portion of a requested charge is abstract and not applicable to the facts of the case, the entire charge is properly refused. Gaston, supra.
The trial judge did give defendant's requested charge number 22, which stated that if Ponder had prior knowledge of the falsity of the representations made by the defendant, if any, they should find the defendant not guilty. See Beaty v. State,48 Ala. App. 699, 703, 267 So.2d 490 (1972), holding that the accused was not guilty of false pretenses where the victim knew the representation to be false and did not believe or rely upon the false representation in issuing a tag receipt.
The two requested charges were also properly denied for a second reason. The refusal of a requested charge does not constitute error where the charge bears citation of authority.St. John v. State, 55 Ala. App. 95, 97-98, 313 So.2d 215, cert. denied, 294 Ala. 768, 313 So.2d 218 (1975).
The authority cited in requested charge number 23 is " 86 So.2d 418." We find no such authority. However, language similar to that used in the charge is found in Torres v. StateFarm Fire Casualty Co., 438 So.2d 757, 758-59 (Ala. 1983), a case involving civil fraud:
 "Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some *Page 1268 
measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts the plaintiffs should not recover. Bedwell Lumber Co. v. T T Corporation, 386 So.2d 413, 415
(Ala. 1980).
 " 'If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volunti non fit injuria".'
"Munroe v. Pritchett, 16 Ala. 785, 789 (1849)."
The authority cited for requested charge 24 is Cook v. Brown,393 So.2d 1016, 1019 (Ala.Civ.App. 1981), another case involving civil fraud:
 "Although a plaintiff alleged to have been injured by a defendant's misrepresentation must have in fact acted upon it to his injury believing it to be true to maintain his action for fraud against the defendant, if he had prior knowledge of its falsity or if the circumstances surrounding the pronouncement of same would have aroused suspicion as to its validity in the mind of a reasonable person, he cannot be said to have reasonably relied upon the misrepresentation and, therefore, cannot obtain damages or other relief from defendant. See Shahan v. Brown, 167 Ala. 534, 52 So. 737 (1910); Mid-State Homes, Inc. v. Holt, 52 Ala. App. 415, 293 So.2d 476 (1974)."
In Dickinson v. Moore, 468 So.2d 136, 138 (Ala. 1985), these principles were affirmed:
 "If a party upon exercising reasonable care would have discovered the facts or have had reason to doubt the truth of the representation, the plaintiff should not recover. Torres v. State Farm Fire Casualty Co., 438 So.2d 757, 759 (Ala. 1983); Bedwell Lumber Co. v. T T Corp., 386 So.2d 413 (Ala. 1980). If a plaintiff has knowledge or notice of certain facts which would excite inquiry or surrounding circumstances which would have aroused suspicion in the mind of a reasonable person, a plaintiff cannot be said to have relied upon a misrepresentation and cannot recover. Village Toyota, 433 So.2d [1150] at 1154 [Ala. 1983]."
* * * * * *
 "In this case, while we agree that a purchaser should not 'close his eyes where ordinary diligence requires him to see,' Torres, supra, 438 So.2d 757 (citing Munroe v. Pritchett, 16 Ala. 785, 789 (1849)), we nevertheless cannot allow a seller of land to induce the purchase by misrepresenting facts he knew to be false. Accordingly, we affirm."
An additional rule in cases involving civil fraud is that "[t]he doctrine of caveat emptor is not applicable where the party injured is induced by the fraud of the other party to act without inspection of the property, the subject of the transaction." Gulf Electric Co. v. Fried, 218 Ala. 684, 689,119 So. 685 (1928); Smith v. McDonald, 24 Ala. App. 88, 92,130 So. 516 (1930).
 "The fact that the party to whom the representations are made may have discovered the truth by investigation is immaterial where he is fraudulently induced to forgo making inquiries or investigations, in whole or in part, which he otherwise would make, where the representations are of such a character or are made in such a way as to disarm his vigilance, lull his suspicions, and induce him to refrain from making such inquiries or examinations, or where, by trick or artifice, he is prevented by the other party from making such an examination." 37 Am.Jur.2d Fraud and Deceit § 258 (1968).
Authority for the principles involved in the defendant's requested charges is found in the cases involving civil fraud in this state. In cases involving criminal fraud, those same principles are not so apparent.
In the early Alabama criminal cases involving fraud, it was held that a victim's *Page 1269 
lack of prudence in detecting the falsity of the representation was no defense:
 "A false pretense, to be indictable, must be calculated to deceive and defraud. As of an actionable misrepresentation, it must be of a material fact, on which the party to whom it is made, has the right to rely; not the mere expression of an opinion, and not of facts open to his present observation, and in reference to which, if he observed, he could obtain correct knowledge. Whether the prosecutor could have avoided imposition from the false pretense, if he had exercised ordinary prudence and discretion to detect its falsity, is not a material inquiry. As a general rule, if the pretense is not of itself absurd or irrational, or if he had not at the very time it was made and acted on, the means at hand of detecting its falsehood, if he was really imposed on, his want of prudence is not a defense. . . . The prosecutor had a right to rely on the representation, and there was no obligation or duty to the prisoner to inquire into its truth, or whether he was dealing fairly and honestly." Woodbury v. State, 69 Ala. 242, 245-46 (1881) (emphasis added).
Following Woodbury are Jenkins v. State, 97 Ala. 68,12 So. 110, 111 (1893) ("The fact that there was a mortgage on the property, recorded in a different county from that in which Harbour [victim-purchaser] lived, and in which the false pretenses were made, Harbour having no notice of the existence of such mortgage, cannot avail the defendant."); Harvey v.State, 41 Ala. App. 300, 302-03, 130 So.2d 823 (1961) (In a prosecution for obtaining property by false pretense in connection with the sale of an automobile represented to be unencumbered, requested charges were properly refused because they "would put the burden upon Ingram [victim-purchaser] to have searched the records of Jefferson County before he could claim that he was defrauded by the appellant's statements.");Carroll v. State, 18 Ala. App. 649, 650, 94 So. 194 (1922) ("[T]he charges do not correctly state the law. The point raised in these charges is that, if the injured party had, at the time the pretense was made, the means of detecting the falsehood or the pretense, and failed to use such means to detect the falsehood, the defendant should be acquitted. The contrary rule is laid down in Woodbury v. State."); Clark v.State, 14 Ala. App. 633, 635, 72 So. 291 (1961) ("The indictment [for false pretenses] is sufficient if the pretense is not patently absurd or irrational, or if the defrauded party had not at the very time it was made and acted on the means at hand of detecting its falsehood, and his want of prudence is no defense."). Consequently, an indictment alleging a pretense which appears upon its face to have been frivolous, immaterial, or incapable of operating to induce one to part with his property is insufficient and will not support a conviction.Meek v. State, 117 Ala. 116, 23 So. 155, 157 (1898); Jones v.State, 28 Ala. App. 254, 182 So. 402 (1937), cert. granted,236 Ala. 30, 182 So. 404 (1937).
Recently, it has been held that reliance is an element of theft by deception, the criminal code version of false pretenses:
 "The former general false pretense statute punished anyone 'who, by false pretense or token and with the intent to injure or defraud, obtain[ed] from another any money or other personal property.' Code 1975, § 13-3-90. In applying the statute, the courts read a reliance requirement into the law. The pretense itself must be a material one, furnishing an inducing, controlling motive for the victim in parting with his property, Ex parte Thaggard, 276 Ala. 117, 159 So.2d 820 (1963), though it need not be the sole or exclusive cause for the loss. Franklin v. State, 44 Ala. App. 521, 214 So.2d 924 (1968). The fact that the victim was not diligent, but imprudent will not negate his reliance if the misrepresentation would have caused a reasonably prudent person to act. Elmore v. State, 138 Ala. 50, 35 So. 25 (1903). The gist of the offense is the deception imposed upon the victim's confidence which causes him to intend to part with his property (title) without a fair opportunity *Page 1270 
to bargain. See Carlisle v. State, 76 Ala. 75
(1884)." Ex parte Day, 481 So.2d 1169, 1171
(Ala. 1985) (emphasis added).
In concluding that reliance is not justified where the misrepresentation would not have caused a reasonably prudent person to act, our Supreme Court relied on Elmore v. State,138 Ala. 50, 35 So. 25 (1903).
In Elmore, the defendant was charged with obtaining money from a bank by falsely pretending that he had a bale of cotton at a cotton gin. In applying for a loan, which he obtained, the defendant showed a bank officer some cotton which he represented as being a sample of the bale of cotton belonging to him and stored at a gin. The defendant also showed the officer a "round bale ticket." On the ticket were the printed words, "This is not a cotton receipt." The evidence tended to show that the bank officer did not read the receipt but relied upon the defendant's representations. In that case it was held that the trial judge properly refused a requested charge stating, "If the jury believes that by proper diligence M.S. Blank could have at that time informed himself as to the correctness of said receipt, and failed to do so, then the jury must find the defendant not guilty." 35 So. at 26.
 "From the evidence above referred to it was open to the jury to find that the loan was made in reliance on verbal misrepresentations of the defendant as to his ownership of cotton and as to the character of the paper labeled 'Round Bale Ticket,' and that the misrepresentations by themselves, or together with the general appearance of the paper, were such as might have caused one in the exercise of reasonable prudence to lend the money without careful inspection of the paper. Hence the question of defendant's guilt did not necessarily depend on whether Blank used diligence to inform himself of the character of that paper, as is assumed by charge 1." Elmore, 35 So. at 26.
In Day, the Supreme Court also relied on Ex parte Thaggard,42 Ala. App. 229, 159 So.2d 813, cert. denied, 276 Ala. 117,159 So.2d 820 (1963). The defendant relies strongly on Thaggard to support her argument that Ponder had a duty to investigate and that his reliance on her alleged representations was unreasonable. Thaggard involved a charge of false pretense against a defendant who obtained money from a bank by presenting a check drawn on the bank where he had his account to a bank teller who obtained a posted balance from the bank's bookkeeper before cashing the defendant's check. See generally, Annot. 75 A.L.R.3d 1080 (1977). In denying the writ of certiorari, the Alabama Supreme Court held:
 "Conceding arguendo, but not deciding, that presentation of the check to the drawee was an implied representation that defendant had funds on deposit or credit in the amount of the check, we are nevertheless of opinion that, under the stated facts, the Court of Appeals is not in error in concluding that any representation implied from the check was not an inducement or moving cause which induced the bank to part with its money but that the statement or statements made by the bookkeeper to the teller constituted the inducement which caused the bank to part with the money." Thaggard, 276 Ala. at 119, 159 So.2d 820.
In reaching this conclusion, the Court of Appeals relied onCommonwealth v. Drew, 19 Pick. 179 (Mass.1837), and State v.Herman, 162 S.W.2d 873 (Mo. 1942), and expressly limited its opinion: "We expressly confine ourselves (1) to the evidence which was before us; (2) to the transaction at the teller's counter; and (3) solely in the light of a charge of false pretense." Thaggard, 42 Ala. App. at 236, 159 So.2d 813.
Commonwealth v. Drew "is cited generally for the proposition that in order to constitute the offense of false pretenses, the misrepresentation must be of a past or existing fact and cannot be based on a transaction to occur in the future." Comment,Criminal Law — False Pretense — Sole Inducement — Promise orExisting Fact, 17 Ala.L.Rev. 98 (1964) (emphasis in *Page 1271 
original). Drew "cited erroneous authorities" for this proposition. S. Beatty (Now Justice Beatty, Alabama Supreme Court), Alabama Property Offenses — Past, Present, Future, 13 Ala.L.Rev. 98, 112 (1960). See also Comment, 17 Ala.L.Rev. at 98.
Drew also involved the situation where the defendant-drawer presents a check to his own bank. Drew held that the defendant-drawer's actions did not constitute the statutory offense of false pretenses because the presentation of one's own checks on a bank with which one has an account is merely a request to pay and not necessarily an implication or pretense that one had funds in the bank. The checks were presented to "the person whose peculiar province and duty it was to know whether they [checks] ought to be paid or not." Thaggard,42 Ala. App. at 234, 159 So.2d 813, quoting from Drew.[1] In defining false pretense within the meaning of the statute, the Massachusetts court wrote:
 " 'What is a false pretence, within the meaning of the statute? It may be defined to be a representation of some fact or circumstance, calculated to mislead, which is not true. To give it a criminal character there must be a scienter and a fraudulent intent. Although the language of the statute is very broad, and in a loose and general sense, would extend to every misrepresentation, however absurd or irrational or however easily detected; yet we think the true principles of construction render some restriction indispensable to its proper application to the principles of criminal law and to the advantageous execution of the statute. We do not mean to say that it is limited to cases against which ordinary skill and diligence cannot guard; for one of its principal objects is to protect the weak and credulous from the wiles and stratagems of the artful and cunning; but there must be some limit, and it would seem to be unreasonable to extend it to those who having the means in their own hands, neglect to protect themselves. It may be difficult to draw a precise line of discrimination applicable to every possible contingency, and we think it safer to leave it to be fixed in each case as it may occur. 2 East's P.C. 828; Young v. The King, 3 T.R. 98.
 " 'It is not the policy of the law to punish criminally mere private wrongs. And the statute may not regard naked lies, as false pretences. It requires some artifice, some deceptive contrivance, which will be likely to mislead a person or throw him off his guard. He may be weak and confiding and his very imbecility and credulity should receive all practical protection. But it would be inexpedient and unwise to regard every private fraud as a legal crime. It would be better for society to leave them to civil remedies. Roscoe on Crim.Ev. (2d ed.) 419; Goodhall's case, Russ. Ryan, 461.'" Thaggard, 42 Ala. App. 233-34, 159 So.2d 813, quoting Drew.
In finding that the crime of false pretenses had not been committed, the Missouri Supreme Court, in State v. Herman, supra, relied on the fact that the defendant-drawer asked the bank cashier what his balance was, the cashier used the bank's records to ascertain the balance, and the cashier was not prevented from using all the bank's records in determining the defendant's balance before cashing the check. The court noted:
 " 'It is not necessary that the injured party should have conducted an investigation as to the falsity of the pretense to *Page 1272 
make it an offense. 25 C.J. 598, 599, section 26. State v. Starr, 244 Mo. 161, 148 S.W. 862; State v. Donaldson, 243 Mo. 460, 148 S.W. 79. But it is the victim's duty to avail himself of the means of detection at hand at the very time to determine the truth or falsity of the accused's representations.' " Thaggard, 42 Ala. App. at 235, 159 So.2d 813, quoting Herman.
The defendant's argument of reasonable prudence and ordinary care is contrary to the modern view of criminal fraud.
 "Some of the early cases held that the crime was not committed if the misrepresentation would not have deceived a person of ordinary prudence and intelligence, but this is quite unsound. The social interest in safeguarding the individual against fraud includes the individual who is not well equipped to protect himself as well as one better endowed by nature. Hence the accepted view today is that this requirement is satisfied if the misrepresentation was made with intent to deceive and did actually deceive, even though a more intelligent person would not have been misled by this type of fraud." R. Perkins and R. Boyce, Criminal Law p. 378 (3rd ed. 1982).
Under the definition of theft by deception in the Model Penal Code, which is similar to Alabama's § 13A-8-1(1), "[t]here is no requirement that the deception be material, or, except in the one instance noted below ['puffing'], that it be of such a character as would have deceived a reasonable man." Model Penal Code § 223.3(1).
 "In accordance with earlier cases, a false representation qualifies as a false pretense only if it would have deceived a person of ordinary prudence and intelligence. However, under the prevailing view, which recognizes the social reality that the lesser intelligent persons are in greater need of the law's protection than the more intelligent ones, the test is whether the representation deceived the particular person to whom it was made, not whether it would have deceived a person of ordinary prudence and intelligence.
 "A similar conflict of authority exists in respect of the victim's negligence in allowing himself to be deceived. Under one view, the victim's negligence in relying upon the false representation precludes criminal liability, particularly where the victim had equal means of knowing or ascertaining the truth. Under the better view, a defendant who intends to defraud another by means of a false representation and who as a result obtains his money or property will not be heard to claim that the victim was negligent in believing him." C. Torcia, 3 Wharton's Criminal Law
§ 429 (14th ed. 1980).
The general rule is stated in 32 Am.Jur.2d False Pretenses § 55 (1982):
 "Generally, the guilt of one charged with obtaining money or property by false pretenses does not depend on whether the victim could, with reasonable diligence or ordinary prudence, have ascertained that the representations were false. In other words, one who has made false representations cannot excuse himself by saying that if the victim was sharp, diligent, and astute, he could have detected the fraud by using means of detection available to him."
* * * * * *
 "The general rule has been qualified in some cases by the proposition that the want of prudence on the part of the victim in failing to make further investigation as to the truth of a representation made to him is not a defense to a criminal prosecution for obtaining money or property by false pretenses 'if the representation is not of itself absurd or irrational.'"
See also W. Burdick, 2 The Law of Crime 647 (1946):
 "One to whom a false pretense is made, if the pretense is calculated to deceive, is not required to investigate independently the truth of it in order to make the accused liable, since the guilt of the accused 'does not depend upon whether the victim could, with reasonable diligence, have ascertained that the representations were false.'" *Page 1273 
Our review of the Alabama cases involving criminal fraud leads us to the conclusion that the rule in Woodbury,69 Ala. at 245, still prevails and that whether the victim "could have avoided imposition from the false pretense, if he had exercised ordinary prudence and discretion to detect its falsity, is not a material inquiry." Moreover, "if the pretense is not of itself absurd or irrational, or if he had not at the very time it was made and acted on, the means at hand of detecting its falsehood, if he was really imposed on, his want of prudence is not a defense." Woodbury, 69 Ala. at 245-46. The reference inDay, 481 So.2d at 1171, to the "reasonably prudent person" ("the fact that the victim was not diligent, but imprudent, will not negate his reliance if the misrepresentation would have caused a reasonably prudent person to act") does not conflict with or alter the holding of Woodbury. For these reasons, we find that the defendant's requested charges were properly refused.
 III
The defendant contends that the search warrant was improperly executed by private citizens who were not acting at the request of the deputy sheriff.
The record shows that Houston County Deputy Sheriff Mike Gilley executed the search warrant, that he "definitely" asked for help, but that he did not specifically request Alan Wallace, Larry Bolden, or Jim Thomas to help or assist him, and that these three citizens did assist Deputy Gilley in the search. The record also shows that the District Attorney selected the individuals who would assist the deputy after asking the deputy if he required assistance.
Wallace testified that, when they got to the offices to be searched, Deputy Gilley "asked us to begin looking through files and desks and examining documents to see whether or not they were types of documents that were specified in the search warrant as being those items that needed to be obtained in the search."
Alabama Code 1975, § 15-5-7, provides: "A search warrant may be executed by any one of the officers to whom it is directed, but by no other person except in aid of such officer at his request, he being present and acting in its execution." This section is to be strictly construed. Rivers v. State,406 So.2d 1021, 1022 (Ala.Cr.App.), cert. denied, 406 So.2d 1023 (Ala. 1981).
The execution of a search warrant by an unauthorized person renders the search illegal. United States v. Martin,600 F.2d 1175 (5th Cir. 1979). Our "statute does not confer any substantive authority to execute a search warrant, but was meant to enlarge the common law rule which required that a search warrant be directed only to a particular person and be executed only by that person." Martin, 600 F.2d at 1181.
Here, there was sufficient compliance with the requirements, purpose, and intent of § 15-5-7. The evidence convinces this Court that the civilians were acting at the deputy's implied if not specific, direction and request in the actual execution of the warrant.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] While in Thaggard the Alabama courts found that the defendant's conduct in presenting to his bank a check payable to cash in the amount of some $43,000 in excess of the amount he knew he was entitled to withdraw from the bank did not constitute false pretenses, a contrary result on the very same facts was reached in Thaggard v. United States, 354 F.2d 735
(5th Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222,16 L.Ed.2d 301 (1966). Here, it was held that there could be "little doubt" that the defendant's actions in preparing and presenting the check "induced" the bank to part with possession, if not title, to the money and that the trial judge's reference to "trick" or "fraud" or "inducement" in his oral instructions to the jury was proper. 354 F.2d at 738.